971 P.2d 199

**Octavio FELIX, Petitioner,**

v.

**The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

**Team Personnel, Respondent Employer,**

**Fireman's Fund, Respondent Carrier,**

**Swiss Plastering & Interiors, Inc., Respondent Employer,**

**Special Fund Division/No Insurance Section, Respondent Party in Interest.**

**No. 1 CA–IC 97–0060.**

Court of Appeals of Arizona, Division 1, Department C.

April 28, 1998.

As Amended May 5, 1998.

Cecil A. Edwards, Jr., Phoenix, for Petitioner.

Anita R. Valainis, Chief Counsel The Industrial Commission of Arizona, Phoenix, for Respondent.

Cook & Fitch, Douglas A. Belknap, Phoenix, for Respondents Team Personnel & Fireman's Fund.

Philip A. Seplow, Phoenix, for Respondent Swiss Plastering.

James F. Crane, Chief Counsel State Compensation Fund by Charles W. Ferris, Jr., Phoenix, for Respondent Party in Interest.

FIDEL, Presiding Judge.

¶ 1 Because workers' compensation payments for loss of earnings are calculated as a percentage of the injured worker's average monthly wage, employers have an incentive to minimize their liability for such benefits by categorizing a portion of their workers' earnings as reimbursement for expenses and not wages. A device used sometimes for this purpose is to pay workers a sum, separate and distinct from designated wages, for "tool rental," purportedly to compensate for wear and tear on personal tools the workers bring to the job. Such payments may be legitimate expense reimbursements, but may be ruses. To separate the former from the latter, such payments "are not to be excluded from a calculation of the average monthly wage unless they bear a reasonable relationship to the actual work-related expense incurred." *Pinetop Truck & Equip. Supply v. Industrial Comm'n,* 161 Ariz. 105, 108, 776 P.2d 356, 359 (App.1989).

¶ 2 In this case, a worker's paycheck was supplemented by an equipment allowance from a "tool procurement" fund that was divided among workers who brought their own tools to the job. Finding no material difference between the tool procurement payment in this case and the tool rental payment considered in *Pinetop,* we conclude that this case is governed by the *Pinetop* standard. In the absence of any evidence that the equipment allowance paid to Claimant bore a reasonable relationship to the actual work-related expense that he incurred, we hold that the administrative law judge ("ALJ") erred in excluding that payment from the calculation of Claimant's average monthly wage.

**I.**

¶ 3 Claimant Octavio Felix, the petitioner, fractured his wrist while working as a plasterer and initiated workers' compensation claims against the two respondent employers, Team Personnel ("Team") and Swiss Plastering & Interiors, Inc. ("Swiss"). Claimant asserts that they jointly employed him on the date of injury.

¶ 4 Team is insured by respondent Fireman's Fund, which acknowledges that Claimant was a Team employee and has accepted the claim. Swiss was uninsured on the date of injury, and the No Insurance Section of the Commission's Special Fund Division ("Special Fund") has processed the Swiss claim. *See generally* A.R.S. § 23–907(B). The Special Fund denies that Swiss was Claimant's employer and has accordingly denied the claim.

¶ 5 At consolidated hearings before the Industrial Commission, the parties disputed (1) whether Claimant was Swiss's employee or only Team's, and (2) the amount of Claimant's average monthly wage. The material evidence was this:

¶ 6 Swiss, a plastering subcontractor, administers fifty to one hundred subcontracts at a time. For each subcontract, a Swiss supervisor chooses a crew leader, who in turn recruits a plastering crew and supervises the crew's performance of the job. Instead of placing its crew leaders and crews on the Swiss payroll, however, Swiss contracts with temporary services employers to hire them and provide them workers' compensation coverage. One such temporary services employer is Team, which employed Claimant and the crew that he served on.

¶ 7 From the funds that Swiss receives from a contractor to perform each subcontract, Swiss pays one portion to the temporary services employer for labor costs and dispenses another portion directly to the crew leader and members of his crew as an "equipment procurement" fund. Swiss provides plastering materials for its projects, but the crew leader and crew provide equipment and tools. At the conclusion of a project, based upon information from the crew leader about the equipment used and the workers who provided tools, Swiss issues "procurement" checks to the crew leader and to designated members of the crew. The purpose of these arrangements, according to Swiss witnesses, is to segregate labor from equipment expenses and to avoid the heavy costs of tool disappearance and replacement that Swiss would incur if it supplied tools for its jobs.

¶ 8 Claimant testified that he was offered a plastering job by a crew leader named Tony Gonzalez and worked for Gonzalez under the impression that they were both working for Swiss. Claimant did not hear of Team until after his injury on April 30, 1996, when Gonzalez had him complete an application for Team and paid him with separate checks from Team and Swiss. Claimant testified that he is an experienced plasterer, that he normally earns $12.50 an hour, and that Gonzalez agreed to pay him $13.00 an hour. Claimant denied that Gonzalez discussed a tool allowance or that he made any tool rental contract with Gonzalez or Swiss. According to Claimant, the only tools he provided were a hoc (a plate with a handle used for holding plaster), a trowel, and a darby (an aluminum ruler). These tools cost about $35.00 and last one or two years.

¶ 9 Gonzalez testified that he had worked as a crew leader for several years "at the Swiss." He would "round up" crews and have them "register" before starting with the "company that gave me the job ... and I know it by Swiss." At times, Gonzalez had been paid by "Action," another temporary services employer used by Swiss, but he was not familiar with Team. According to Gonzalez, he was paid a piece rate but paid crew members by the hour.

¶ 10 Gonzalez recalled that Claimant had worked for him for about ten days at an hourly wage plus extra for bringing his own tools. Gonzalez said he started plasterers "at [$6.50] then they go up to [$7.00] but the people who have their own tools and they go from job to job those are the people that I pay [$13.00] for." According to Gonzalez, a plasterer usually earns between $9–12.00 an hour depending on the tools he provides and the job he does. Gonzalez testified that Claimant supplied many tools, including "hocs ..., three or four types of trowels, brushes, floats, wire cutters, [and] darbys...." But Gonzalez did not estimate the value of these tools.

¶ 11 A Team manager testified that Claimant was on Team's payroll working for Gonzalez from April 22 through April 30, 1996, and confirmed that Gonzalez was on Team's payroll at that time. The manager acknowledged, however, that Claimant did not sign an employment application with Team until after his industrial injury. In contrast to Claimant and Gonzalez, who testified that Claimant was paid by the hour, the manager testified that Team paid Claimant at a piece rate that amounted to $450.00 for completed work.

¶ 12 Swiss representatives testified that Swiss paid Claimant two checks totalling $453.00 as his share of the procurement allowance for the Gonzalez crew. They testified that these payments were for tool procurement, not for wages, and confirmed that Swiss had no tool procurement contract with Claimant.

¶ 13 The parties submitted post-hearing memoranda. Claimant argued that he had dual employers and that his average monthly wage should be based upon their combined payments. Swiss argued that Claimant was solely Team's employee and that Swiss's procurement payment should be excluded from the calculation of his average monthly wage. Team and Fireman's Fund argued that Gonzalez's testimony established the usual hourly wage for plasterers as $6.50 to $7.00 and that Claimant's average monthly wage, computed on this basis, would yield a maximum average monthly wage of $1212.40. They further submitted that the ALJ should either accept this usual plasterer's wage as Claimant's average monthly wage or base his average monthly wage on the piece rate he received from Team without reference to the procurement payment he received from Swiss. On either basis, Team asserted, it would accept responsibility as Claimant's sole employer. Alternatively, if the ALJ based his calculation upon Team's and Swiss's combined payments to Claimant, then, according to Team, the ALJ should find that Swiss Plastering either was Claimant's sole employer or that Swiss Plastering and Team Personnel were his joint employers.

¶ 14 We may infer from the award that the ALJ accepted Team's proposal to establish Claimant's monthly wage on the basis of Gonzalez's testimony concerning the usual hourly wage for plasterers. The award, omitting credibility findings—indeed, omitting specific findings altogether—stated in substantive part:

> For the reasons set forth in the post-hearing memorandum submitted by counsel for defendants Team Personnel ·and Fireman's Fund, the evidence establishes that applicant was an employee of Team Personnel when he was injured on April 30, 1996, and applicant's average monthly wage should be set at $1212.40.[1] The evidence further establishes that applicant's

claim against Swiss Plastering and the Commission's No Insurance Section should be dismissed.

After exhausting the administrative review process, Claimant filed a timely petition with this court for appellate review.

## II.

■ ¶ 15 We limit our review to the omission of the procurement payment from the calculation of Claimant's average monthly wage. Because our resolution of that issue requires us to set the Commission award aside and remand for a hearing de novo, we need not consider other disputed matters, including Swiss's status as Claimant's joint-, sole-, or non-employer.[2]

¶ 16 The respondents-in-interest argue that, by relying on a $7.00 usual hourly wage for plasterers, the ALJ mooted any need to sort out the actual payments to Claimant or determine the status of Swiss's procurement payment among them. Because Claimant was not continuously employed for thirty days before his injury, Arizona Revised Statutes Annotated ("A.R.S.") § 23–1041(B) governs this case. Under that statute, an ALJ has discretion to rely on evidence of wages of similarly employed workers to set an average monthly wage. A.R.S. § 23–1041(B); *see, e.g., Pena v. Industrial Comm'n*, 140 Ariz. 510, 513, 683 P.2d 309, 312 (App.1984).

■ ¶ 17 We agree only in part. We recognize that the ALJ was statutorily entitled to base Claimant's average monthly wage upon evidence of the usual wage for plasterers instead of basing it upon the wages that Claimant actually received. We disagree, however, that Gonzalez's testimony reasonably supported a finding that plasterers similar to Claimant receive a usual wage of $7.00 per hour. Although Gonzalez testified that he started some plasterers at $6.50 to $7.00 an hour, he testified that he started others at roughly double that amount—those

---

1. We can infer that the ALJ accepted $7.00 as a plasterer's usual hourly wage because, at 40 hours per week and 4.33 weeks per month, a $7.00 hourly wage amounts to $1212.40 per month.

2. When we set aside an award for any reason, we must ordinarily set the award aside in its entirety. *See* A.R.S. § 23–951(D); *Magma Copper Co. v. Naglich*, 60 Ariz. 43, 131 P.2d 357 (1942). Our setting aside the average monthly wage determination in this case reopens all issues between the parties.

who supplied their own tools and worked multiple jobs. According to Gonzalez, Claimant was a member of the latter group of workers—a group receiving more than $7.00 an hour. Thus, by relying on Gonzalez's testimony to establish an hourly wage of $7.00, the ALJ did not properly avoid determining whether the differential payments to Claimant and similar workers were wages; he merely summarily excluded these payments without analysis. This was error. Far from mooting the question, Gonzalez's testimony squarely presented the question whether the differential payments to Claimant and similar workers constituted part of their wages or legitimate reimbursement for expenses.

■■ ¶ 18 We turn to the question whether Swiss's payments to Claimant must be evaluated by the *Pinetop* standard. In *Pinetop*, we recognized that tool rental payments may be excluded from the average monthly wage if clearly contracted for and reasonably related to the actual work-related expense. *See* 161 Ariz. at 108, 776 P.2d at 359. Here we focus on the second criterion. That is, we will assume for the purpose of disposition that Gonzalez's testimony supports the conclusion that Claimant contracted with Gonzalez to receive a tool allowance for the job. Yet even when clearly contracted for, if a tool allowance is not reasonably related to the replacement cost of the tool, then the method of compensation "evade[s], or at least impermissibly minimize[s], the employer's statutory responsibility to procure benefits for its workers." *Id.*

¶ 19 Team and Fireman's Fund argue that this case is distinguishable from *Pinetop* because in that case, in contrast to this one, "the employer was not using funds from a separate pool of money specifically earmarked for equipment, but instead simply designated a certain percentage of wages as a rental fee." We disagree, however, that a differential bookkeeping arrangement can suffice to exempt a tool allowance from the *Pinetop* standard. Nor do we find any substance to the semantic difference between a "tool rental" allowance and a "procurement" allotment to workers supplying their own tools. Here, as in *Pinetop*, however such

payments may be labeled or accounted for, the essential question remains whether "they bear a reasonable relationship to the actual work-related expense incurred." *Id.* at 108, 776 P.2d at 359.

¶ 20 Claimant and Gonzalez differed in describing the tools Claimant brought to the job. According to Claimant, he supplied only a few tools, which were worth about $35.00 and lasted over a year. According to Gonzalez, Claimant supplied more tools, but Gonzalez did not estimate their value or working life. Yet even supposing Claimant supplied tools with a value three or four times greater than his estimate, Claimant was still paid the far greater sum of $453.00 for only seventy hours of work. In short, the *Pinetop* standard was not satisfied by the evidence in this case; the tool allowance paid to Claimant was not reasonably related to the replacement cost of the tools that he supplied.

¶ 21 In summary, because the record does not reasonably support an average monthly wage of $1212.40, we set aside the award and decision upon review.

LANKFORD, and GRANT, JJ., concur.